AO 106A (08/18) Application for a Warrant by Telephone or Other Reliable Electronic Means

# UNITED STATES DISTRICT COURT
## for the
## Southern District of California

In the Matter of the Search of  )
*(Briefly describe the property to be searched or identify the person by name and address)*  )
)  Case No.  **20MJ1316**
**iPhone Cell Phone MF26OLL (Target Device 3)**  )
**IMEI: 990002676783994**  )
)

## APPLICATION FOR A WARRANT BY TELEPHONE OR OTHER RELIABLE ELECTRONIC MEANS

I, a federal law enforcement officer or an attorney for the government, request a search warrant and state under penalty of perjury that I have reason to believe that on the following person or property *(identify the person or describe the property to be searched and give its location)*:

See Attachment A-3, incorporated herein by reference.

located in the ___Southern___ District of ___Califorina___, there is now concealed *(identify the person or describe the property to be seized)*:

See Attachment B, incorporated herein by reference.

The basis for the search under Fed. R. Crim. P. 41(c) is *(check one or more)*:

☑ evidence of a crime;
☑ contraband, fruits of crime, or other items illegally possessed;
☑ property designed for use, intended for use, or used in committing a crime;
☐ a person to be arrested or a person who is unlawfully restrained.

The search is related to a violation of:

| Code Section | Offense Description |
|---|---|
| 21 USC Secs. 952, 960 | Importation of a Controlled Substance |

The application is based on these facts:
See Attached Affidavit of HSI Special Agent Guillermo Diaz, incorporated herein by reference.

☑ Continued on the attached sheet.
☐ Delayed notice of _____ days *(give exact ending date if more than 30 days:_____)* is requested under 18 U.S.C. § 3103a, the basis of which is set forth on the attached sheet.

*Applicant's signature*

Special Agent Guillermo Diaz, HSI
*Printed name and title*

Attested to by the applicant in accordance with the requirements of Fed. R. Crim. P. 4.1 by ___telephone___ *(specify reliable electronic means)*.

Date: April 2, 2020

*Judge's signature*

City and state: San Diego, California      Hon. Andrew G. Schopler, U.S. Magistrate Judge
*Printed name and title*

# AFFIDAVIT

I, Special Agent Guillermo Diaz, being duly sworn, hereby state as follows:

## INTRODUCTION

1. I submit this affidavit in support of an application for a warrant to search the following electronic devices:

    Motorola Cell Phone XT1955-5 (Target Device 1)
    IMEI: 359527095049838

    Alcatel Cell Phone (Target Device 2)
    IMEI: 015552003462572

    iPhone Cell Phone MF26OLL (Target Device 3)
    IMEI: 990002676783994

    Alcatel Tablet (Target Device 4)

    All items were seized from Rodolfo VETA Jr. under FP&F No. 2020250400138801 ("Target Devices")

as further described in Attachment A-1, A-2, A-3 and A-4, and to seize evidence of crimes, specifically violations of Title 21, United States Code, Section(s) 952, 960 and 963, as further described in Attachment B. The requested warrant relates to the investigation and prosecution of Rodolfo Veta Jr. ("Defendant") for importing approximately 38.94 kilograms (85.84 pounds) of methamphetamine and 1.22 kilograms (2.7 pounds) of heroin from Mexico into the United States. The Target Devices are currently in the evidence vault located at 9495 Customhouse Plaza, San Diego, CA 92154.

2. The information contained in this affidavit is based upon my training, experience, investigation, and consultation with other members of law enforcement.

1  Because this affidavit is made for the limited purpose of obtaining a search warrant for the
2  Target Devices, it does not contain all the information known by me or other agents
3  regarding this investigation. All dates and times described are approximate.

## BACKGROUND

3. I have been employed as a Special Agent with Homeland Security Investigations (HSI) since February 2011. I am currently assigned to the HSI Office of the Special Agent in Charge, in San Diego, California. I am a graduate of the Federal Law Enforcement Training Center in Glynco, Georgia.

4. During my tenure with HSI, I have participated in the investigation of various narcotics trafficking organizations involved in the importation and distribution of controlled substances into and through the Southern District of California. Through my training, experience, and conversations with other law enforcement officers experienced in narcotics trafficking investigations, I have gained a working knowledge of the operational habits of narcotics traffickers, in particular those who attempt to import narcotics into the United States from Mexico at Ports of Entry.

5. I am aware that it is common practice for narcotics traffickers to work in concert utilizing cellular telephones. A common tactic utilized by narcotics traffickers is to smuggle controlled substances into the United States from Mexico by concealing the controlled substances in vehicles that enter the United States at Ports of Entry such as the San Ysidro Port of Entry and the Otay Mesa Port of Entry. With respect to the importation of narcotics in this manner, I am aware that narcotics traffickers in Mexico frequently communicate with the individual ("the driver") responsible for driving the vehicle containing the concealed narcotics into the United States. These communications can occur before, during and after the narcotics are imported into the United States. For example, prior to the importation, narcotics traffickers frequently communicate with the driver regarding arrangements and preparation for the narcotics importation. When the importation is underway, narcotics traffickers frequently communicate with the driver to remotely monitor the progress of the narcotics, provide instructions to the driver and warn

accomplices about law enforcement activity. When the narcotics have been imported into the United States, narcotics traffickers may communicate with the driver to provide further instructions regarding the transportation of the narcotics to a destination within the United States

6. Based upon my training, experience, and consultations with law enforcement officers experienced in narcotics trafficking investigations, and all the facts and opinions set forth in this affidavit, I know that cellular telephones (including their Subscriber Identity Module (SIM) card(s) can and often do contain electronic evidence, including, for example, phone logs and contacts, voice and text communications, and data, such as emails, text messages, chats and chat logs from various third-party applications, photographs, audio files, videos, and location data. In particular, in my experience and consultation with law enforcement officers experienced in narcotics trafficking investigations, I am aware that individuals engaged in drug trafficking commonly store photos and videos on their cell phones that reflect or show co-conspirators and associates engaged in drug trafficking, as well as images and videos of drugs or contraband, proceeds and assets from drug trafficking, and communications to and from recruiters and organizers.

7. This information can be stored within disks, memory cards, deleted data, remnant data, slack space, and temporary or permanent files contained on or in the cellular telephone. Specifically, searches of cellular telephones may yield evidence:

    a. tending to indicate efforts to import methamphetamine, or some other federally controlled substance, from Mexico into the United States;

    b. tending to identify accounts, facilities, storage devices, and/or services–such as email addresses, IP addresses, and phone numbers–used to facilitate the importation of methamphetamine, or some other federally controlled substance, from Mexico into the United States;

    c. tending to identify co-conspirators, criminal associates, or others involved in importation of methamphetamine, or some other federally controlled substance, from Mexico into the United States;

d.     tending to identify travel to or presence at locations involved in the importation of methamphetamine, or some other federally controlled substance, from Mexico into the United States, such as stash houses, load houses, or delivery points;

e.     tending to identify the user of, or persons with control over or access to, the Target Device; and/or

f.     tending to place in context, identify the creator or recipient of, or establish the time of creation or receipt of communications, records, or data involved in the activities described above.

## FACTS SUPPORTING PROBABLE CAUSE

8. On March 31, 2020, at approximately 8:45 A.M., Rodolfo VETA ("Defendant"), a United States citizen, was waiting in lane #19 in order to apply for entry into the United States from Mexico through the San Ysidro Port of Entry. VETA was the driver, sole occupant, and registered owner of a 2013 Ford F-150 ("the vehicle") bearing California license plates.

9. A Customs and Border Protection Officer ("CBPO") assigned to the Anti-Terrorism Contraband Enforcement Team ("A-TCET") was conducting roving, pre-primary operations. While roving, the CBPO targeted the vehicle and the vehicle's driver, later identified as the Defendant, for inspection.

10. The CBPO made contact with the Defendant and asked him where he was going. The Defendant replied that he was on his way to the unemployment office on Palomar Street in Chula Vista, California. The CBPO asked the Defendant if he was bringing anything back from Mexico, and the Defendant responded that he was not. The CBPO also asked the Defendant if the vehicle belonged to him, to which the Defendant relied that it did. The CBPO received two negative declarations from the Defendant.

11. While speaking to the Defendant, the CBPO observed that he appeared very nervous and was constantly moving around in his seat. The CBPO also noticed that the Defendant was eating and drinking his food really fast while he was being questioned. The

4

CBPO noted that every time the Defendant would raise his hand to pick up his food, his hands were visibly shaking, to the point where the Defendant almost missed his mouth. The Defendant was also breathing so heavily that he almost choked on his food.

12. The CBPO observed that the vehicle's spare tire was abnormally clean and appeared to be flat. The CBPO touched the spare tire and felt something solid, as if there were something in the tire. When the CBPO asked the Defendant to hand over the vehicle keys, the Defendant's hand was shaking so bad that the keys made audible sounds. The CBPO placed the Defendant in handcuffs and escorted him the Security office. Once in the Security office, the CBPO conducted a pat-down of the Defendant with negative results. The Defendant was then turned over to the Security office for processing.

13. A Canine Enforcement Team was in the vehicle secondary lot conducting K9 operations when the Human and Narcotic Detection Dog alerted to a trained odor in the undercarriage of the vehicle. A CBPO operating the Z-Portal X-Ray machine detected anomalies in the spare tire and roll up bed cover storage box.

14. Further inspection of the vehicle resulted in the discovery of a total of seventy-seven (77) packages. Sixty (60) of the packages were concealed in the spare tire of the vehicle, and seventeen (17) packages in the bed liner, roll up compartment of the vehicle. Seventy-six (76) of the packages were similar in shape and packaging. One (1) of the Seventy-six (76) packages was randomly selected by the CBPO and the substance contained within was a white crystal-like, which tested positive for the properties of methamphetamine. The test was conducted by using a GEMINI testing instrument.

15. One (1) of the packages located was different in shape and packaging from the others. This package was opened by the CBPO and the substance discovered within it was a brown, powder-like substance, which field tested positive for the properties of heroin using the Heroin Reagent System Narcotics Kit. One Apple Cellphone (Target Device 3) was located behind the steering wheel console cover, located beneath the steering wheel, just above the gas and brake pedals.

16. The total approximate weight of the seventy-six (76) packages containing a

substance believed to be methamphetamine was 38.94 kilograms (85.84 pounds). The total approximate weight of the one (1) containing a substance believed to be heroin was 1.22 kilograms (2.7 pounds).

17. The Defendant was placed under arrest at approximately 10:52 A.M.

18. The Defendant was not interviewed due to exhibiting flu-like symptoms.

19. The Defendant was arrested and charged with a violation of Title 21, United States Code, 952 and 960, importation of a controlled substance. VETA was given a Notice to Appear on May 1, 2020 at 1:30 P.M. and was released from custody by CBP.

20. Target Device 1, 2 and 4 were found in the center console, cup area, of the defendant's vehicle and were seized at the time of arrest. Target Device 3 was found behind the steering wheel console cover, located beneath the steering wheel, just above the gas and brake pedals, also seized at the time of arrest.

21. In my training and experience, narcotics traffickers may be involved in the planning and coordination of a drug smuggling event in the days and weeks prior to an event. Co-conspirators are also often unaware of a defendant's arrest and will continue to attempt to communicate with a defendant after their arrest to determine the whereabouts of the narcotics. Based on my training and experience, it is also not unusual for individuals, such as Defendant, to attempt to minimize the amount of time they were involved in their smuggling activities, and for the individuals to be involved for weeks and months longer than they claim. Accordingly, I request permission to search the Target Devices for data beginning on August 12, 2019 through September 13, 2019, which was the day following Defendant's arrest.

## METHODOLOGY

22. It is not possible to determine, merely by knowing the cellular telephone's make, model and serial number, the nature and types of services to which the device is subscribed and the nature of the data stored on the device. Cellular devices today can be simple cellular telephones and text message devices, can include cameras, can serve as personal digital assistants and have functions such as calendars and full address books and

can be mini-computers allowing for electronic mail services, web services and rudimentary word processing. An increasing number of cellular service providers now allow for their subscribers to access their device over the internet and remotely destroy all of the data contained on the device. For that reason, the device may only be powered in a secure environment or, if possible, started in "flight mode" which disables access to the network. Unlike typical computers, many cellular telephones do not have hard drives or hard drive equivalents and store information in volatile memory within the device or in memory cards inserted into the device. Current technology provides some solutions for acquiring some of the data stored in some cellular telephone models using forensic hardware and software. Even if some of the stored information on the device may be acquired forensically, not all of the data subject to seizure may be so acquired. For devices that are not subject to forensic data acquisition or that have potentially relevant data stored that is not subject to such acquisition, the examiner must inspect the device manually and record the process and the results using digital photography. This process is time and labor intensive and may take weeks or longer.

23. Following the issuance of this warrant, I will collect the subject cellular telephone and subject it to analysis. All forensic analysis of the data contained within the telephone and its memory cards will employ search protocols directed exclusively to the identification and extraction of data within the scope of this warrant.

24. Based on the foregoing, identifying and extracting data subject to seizure pursuant to this warrant may require a range of data analysis techniques, including manual review, and, consequently, may take weeks or months. The personnel conducting the identification and extraction of data will complete the analysis within ninety (90) days of the date the warrant is signed, absent further application to this court.

**PRIOR ATTEMPTS TO OBTAIN THIS EVIDENCE**

25. Law enforcement has not previously attempted to obtain the evidence sought by this warrant. At the time of Defendant's entry into the United States, law enforcement officers did not conduct a manual review OR forensic download of the Target Devices.

7

## CONCLUSION

26. Based on the facts and information set forth above, there is probable cause to believe that a search of the Target Device will yield evidence of Defendant's violations of Title 21, United States Code, Sections 952, 960 and 963.

27. Because the Target Device was seized at the time of Defendant's arrest and has been securely stored since that time, there is probable cause to believe that such evidence continues to exist on the Target Devices. As stated above, I believe that the appropriate date range for this search is from March 1, 2020 through April 2, 2020.

28. Accordingly, I request that the Court issue a warrant authorizing law enforcement to search the item(s) described in Attachment A and seize the items listed in Attachment B using the above-described methodology.

I swear the foregoing is true and correct to the best of my knowledge and belief.

_____
Special Agent Guillermo Diaz
Homeland Security Investigations

Subscribed and sworn to before me this 2nd day of April 2020.

_____
Hon. Andrew G. Schopler
United States Magistrate Judge

8

## **ATTACHMENT A-3**

### PROPERTY TO BE SEARCHED

The following property is to be searched:

    iPhone Cell Phone MF26OLL (Target Device 3)
    IMEI: 990002676783994

The Target Device is currently in the possession of Homeland Security Investigations, 9495 Customhouse Plaza, San Diego, CA 92154.

# ATTACHMENT B

## ITEMS TO BE SEIZED

Authorization to search the cellular telephone described in Attachment A includes the search of disks, memory cards, deleted data, remnant data, slack space, and temporary or permanent files contained on or in the cellular telephone for evidence described below. The seizure and search of the cellular telephone shall follow the search methodology described in the affidavit submitted in support of the warrant.

The evidence to be seized from the cellular telephone will be electronic records, communications, and data such as emails, text messages, chats and chat logs from various third-party applications, photographs, audio files, videos, and location data, for the period of March 1, 2020 through April 2, 2020.

a. tending to indicate efforts to import methamphetamine, heroin, or some other federally controlled substance, from Mexico into the United States;

b. tending to identify accounts, facilities, storage devices, and/or services– such as email addresses, IP addresses, and phone numbers–used to facilitate the importation of methamphetamine, or some other federally controlled substance, from Mexico into the United States;

c. tending to identify co-conspirators, criminal associates, or others involved in importation of methamphetamine, or some other federally controlled substance, from Mexico into the United States;

d. tending to identify travel to or presence at locations involved in the importation of methamphetamine, or some other federally controlled substance, from Mexico into the United States, such as stash houses, load houses, or delivery points;

e. tending to identify the user of, or persons with control over or access to, the Target Device; and/or

f. tending to place in context, identify the creator or recipient of, or establish the time of creation or receipt of communications, records, or data involved in the activities described above;

which are evidence of violations of Title 21, United States Code, Sections 952, 960 and 963.